Thank you. Will the clerk call the next case? 118-27-19-WC. Senator Mulvaney. Kirsten Davis. Counsel, you may proceed. I'm pleased to report, Counsel, and before I begin I would like to thank the court for granting continuances to the three medical, surgical procedures I am on with this year. There's two major issues in the case. I may have missed it, but would you give your name, please? I'm sorry. Stuart Galesburg. Thank you. There's two major issues in the case, and a second and a smaller one in the beginning of the case, which is important. The first one was that the defendant, without medical causation or medical background, terminated the claimant's TCD and medical benefits on May 22nd of that while she was under the care of Dr. John Fernandez, hand surgeon. And he did not at that time. The last visit was May. The second to last visit on May 11th of 10, Dr. Fernandez, which is not in the defendant's brief, allowed her only to return to work with no right hand or right arm use. That was the restriction. So that's Dr. Fernandez you're talking about? John Fernandez, yes. Okay. And the commission noted the opinions of Dr. Bender? Bender was an IME. All right. And he gave a contrary opinion, right? He, from an orthopedic standpoint, he gave a contrary opinion. He said the condition had stabilized. Stabilized. But then she also developed fibromyalgia, and Dr. Bender, in that instance, said he doesn't diagnose fibromyalgia, a family doctor, a rheumatologist does. That was a chain of events that occurred. But the other major thing that I bring up in the brief and what happened is that Dr. Fernandez found the claimant at MMI on November 10th of 2010 with severe restrictions of spica splints in both hands. No use of tools, no repetitive use of her hands. And no, the defendant did not present any vocational assessment, either in May or in November of 10th, to assess whether under Rule 71.10, as required in the four sections of the rule, and pursuant to Section 8, as required by employers. What is it employers are required to do? They're required to have a vocational assessor meet with the petitioner and her counsel. And they're supposed to do that on their own, or they're supposed to do it pursuant to a request? They're supposed to do it on their own. Their obligation is on their own. It's stated in Roper and also in Ameritech services. Ameritech services argued in the decision before this court, three times they gave excuses, they called it the tipping point, why Ameritech didn't have to give 71.10 vocational assessment to the injured worker. And then in the beginning, this woman was a convicted, non-violent convicted felon. She got out of jail in January of 06. This is your claimant? Yes. Who are you talking about? My client. Okay. All right. And now I'm going back to, so she was hired, I think, in April by the defendant. She had an injury, 6106, called a TFCC, a triangular fibro-catalytic complex, involving the wrist, trapezium bone, and the thumb. She had a nurse case manager meet with me and her to assess her situation at the commission. And she was sent for an IMA in October of 06 with Dr. Papirsky, a hand specialist. And he wasn't given an EMG. It was done in October of 06. He wasn't given an MRI of the hand in July 27th of 06. Are we past the TTD? Are we on the issue of whether or not the accident was causally connected to the fibromyalgia and the major depression? Is that what we're talking about now? No. What I want to do is show that in the beginning, after she was denied care for her injury, standing on 6106, she did a self-created job search, and she got a job for a year and a half with Waldo Corp. working with a damaged hand because the doctor didn't get it. The IME doctor did not get an MRI until May of 08, and then he reversed his opinion when he got it. Dr. Terry Light at Loyola was the treating hand specialist. He recommended right-hand surgery in August of 07, and that was still not approved until May of 08. She worked in light-duty accounting work with a bad hand and developed bilateral CTS, and she filed a separate claim for that against Waldo Corp. And then the business closed. She got another job for six weeks. She had an emergency hysterectomy in August of 08. Finally, on November 14 of 08, she had the TFCC surgery with Dr. Fernandez and a right CTS with Waldo on November 14 of 08. You've given us a very detailed background, so you don't spend all of your time. What are you asking us to do relative to the commission's decision? The commission — okay. That's what you're presenting. You're saying the commission erred. The commission erred in, one, they didn't address the issue of maintenance at all. They didn't address the issue of vocational assessment under Rule 8A. Well, they didn't find the present condition at all. They didn't find fibromyalgia and major depression. Didn't find that it arose out of or occurred in the course of her employment. It was stipulated that she had an accident arising out of her employment. Uh-huh, but her— There was a— Okay. She went to a room. She had to get to causation. She was not feeling well after they cut her benefits off. She got worse. She got depressed. She had feelings all over her body. She went to her family, Dr. Luby, who gave her an RF, did a physical blood test, and she had an RF factor of 26, rheumatoid factor. He referred her to Dr. Soroushan, a rheumatologist. He diagnosed fibromyalgia. Okay, so really aren't we here because she fell, tripped, and grabbed something, and the respondent, not defendant, the respondent here is Davis, right? Yes. Okay. And so this cascade of conditions that she's experiencing, you're trying to say, all goes back to that injury, right? Well, she had a thumb fusion on March—in August of 2009. She had a hardware removal and tenalysis in March of 2010. In August of 2010, she had a left CTS, and the CTS are not related, they're related to a case she settled against Waldo, where she worked in light duty in her self-created job search. So what I'm saying is that the commission didn't address issues which are in the stipulation sheet, a vocational assessment under 7110, and they didn't address the cutoff of TTD and medical benefits as of May 22nd of 2010. No doctor, nobody. The claimant went to Dr. Fernandez and says, I think I plateaued. The doctor said, no right hand work, no right arm work. And they argued that that was the doctor who said she plateaued. Now, the doctor— Let me ask you this. I have to ask you this question. Dr. Vendor opined that the claimant could return to work without restriction. Ms. Babitz, who apparently is the employer's vocational expert, said that claimant possessed education skills sufficient to obtain gainful employment without the need for rehabilitative services. So isn't that in the record? That's in the record, and that is a very good question because arbitration of 11 hearings began June 13th of 2013. In anticipation of litigation, Ms. Babitz was retained by the employer on January 13th. She wrote her vocational assessment on February 13th without meeting with the claimant. This is two and a half years after she reached MMI. So it was made in anticipation of litigation. Just like the defendant cited Euclid, Euclid states had— in that case, they denied an 8D1 versus PPD because the vocational assessment was done in anticipation of litigation. And they said there was less credibility, it's speculation. In this case, Ms. Babitz wasn't given all the records by defendants. The rules 7110 say you don't do a blind evaluation, and you don't do a vocational assessment two and a half years after MMI. And the arbitrator wrote 36 pages in his decision, awarding a permanent total. He awarded maintenance. It should have been TTD because she wasn't awarded vocational rehab. You only get maintenance if you get vocational rehab. And it should have been TTD. And the commission, it's like night and day. She's all of a sudden shemerical. It's dreams. She planned all this. This was all her dream of what was going to happen. That's why I bring up that she could have filed a 19B after her initial injury. Instead, she did a self-created job search and worked for almost two years before the surgery was approved to her right hand. And that's why I bring that up. And Dr. Sarooshan even said that the employer should have sent her to a rheumatologist, not to an orthopedic surgeon, because she had major depression. In March of 2011, she came under the care of a psychiatrist. She was on fentanyl patches. She was on some heavy-duty medicine. And the defendant indicates, well, she said this, she said that. Her weight was off. She did various things. She was on video when she went to Dr. Gunnell. Dr. Gunnell was a psychologist. He said that she could return to work after her hysterectomy. After her hysterectomy, she started having the surgery, which was approved. And there's some question about the validity of the IME doctor's opinions and the fact that the vocational assessment was made in anticipation of litigation and how much value can the commission put on that versus the assessment we had in 2011 by Jeffrey Lucas, who took a video deposition. He's been doing this 20 to 30 years, licensed vocational counselor. His opinion was that she could not return again to employment before she was even diagnosed, or as of 11-10-10, without the fibromyalgia, with the spiker splints on both hands with the restrictions that Dr. Fernandez did. And then Dr. Sarooshan testified that she had a chain reaction, a series of events that led to the fibromyalgia and that she was totally disabled under 8F, not as an adult. Do you have more? I guess so. Well, you'll have time to reply. Okay. Thank you. Thank you. Counsel, you may respond. May it please the Court, good morning, Your Honors. Good morning, Counsel. Matthew Ganoffo here for the Employers, Davis Staffing and Financial Applications. I'd like to begin, please, Your Honors, with exactly the way the Commission started its conclusion. Quote, the Commission finds Ms. Fogarty not credible. The picture painted by Ms. Fogarty is at best Wilder-esque. It is as if she is opening a fortune cookie and looking inside for a prize. The facts at hand belie a permanent total disability finding. Her thumb injury has been repaired, and now she claims total body failure. Her claim is as without merit as she is without credibility. The record is replete with evidence supporting the find that Ms. Fogarty is not credible. That's rather colorful writing. Is it necessary? I've never seen anything like it, Your Honor. It must have been necessary considering the Commission's opinion of Ms. Fogarty's case. That's the only way I can explain it. They didn't find her credible, period. Is that the bottom line? They couldn't have said it more strongly, Your Honor. These aren't my words. These aren't the words of my employers. This is a unanimous panel of Commissioners. They put this in their decision after weighing the evidence. So three times in these few sentences they attack her credibility. The Circuit Court decision comments on the pains the Commission decision indicates and how utterly bereft of credibility it found Petitioner to be. So the Commission attacked her credibility with the history of felony theft and money laundering. They talked about Dr. Ganellan's opinion. That was our psych IME. Ms. Fogarty deliberately and consciously overstated the problems she was currently experiencing to convince others she was disabled. They commented on Dr. Vendor, as Your Honor did. Dr. Vendor found no evidence to support the claim that her hand was dead. She's using a wheelchair. This came up in oral arguments at Commission. No doctor has ever prescribed a wheelchair. And then she lied to Dr. Serugian about the history involved here. Now, as noted in my brief, the Commission is the judge of witness credibility. It absolutely got it right here, Your Honors. There's more than enough evidence to support its decision. Commission weighed the evidence of the treating doctors with those of the doctors we had examine her and, again, specifically found Drs. Vendor and Drs. Ganellan persuasive. They comment on Dr. Vendor indicating no true objective pathology in the right hand. No basis for any alleged current condition to be related to the June 2006 incident. And, as Your Honor said, no need for work restrictions. Dr. Ganellan commented on the fact that Petitioner worked for two years at the different employers after the June 2016 incident. Counsel commented that this was a light-duty accounting job. This is her work. She's an accountant. It's a full-duty job for her because she's an office worker doing accounting work. It wasn't anything different that she was doing in that job versus the job prior to the June 2006 incident. Counsel commented about not filing a 19B, looking for TTD, and instead getting a job. But at the same time, she said she's working with an extremely damaged hand. Well, she could have filed a 19B to get the surgery awarded at that time, Your Honor. She didn't. Dr. Ganellan also comments not an accurate, reliable history provided. Again, she's trying to convince people that she's disabled. The commission picked up on this, Your Honor. So the commission went as far to write, Boberty's claim her fibromyalgia is related to the work accident is nothing more than a ruse to get permanent total disability. Linking fibromyalgia to the accident is nothing more than speculation, if not farcical. Again, this extremely colorful language that the commission must have thought was warranted, considering what it thought of her claim. Do we have to look at the colorful language? I mean, this is – I'm a little concerned about that type of writing. You're concerned about the colorful language? Yeah. Yeah, I mean, we're arguing colorful language as though it's somehow the decisions that may be found to be outrageous by somebody in their opinion should be given more weight. I mean, it's the logic of the opinion. It's based upon the record. The logic – the record is there supporting the opinion. There's no doubt, Your Honor. They didn't have to use – Isn't that the way in courts of law we're supposed to argue and we're supposed to write as judges? I'm just bothered by some of that language, to be honest with you, because I think it opens the door for advocacy to add weight to colorful language that is inappropriate and not necessary. None of those words were in my proposed decision, Your Honor. I know they weren't, but we're falling prey to argument, and I'm not accepting of that. Okay. Well, there's no doubt that they didn't find it credible. I suppose that's the big picture here, Your Honor. That is the substance of your argument. Well, not only did they not find her credible, but they weighed the evidence. They looked at her experts, compared them to our experts, found our experts more persuasive. They found her experts contrived. This is in the decision, too. They go on to say, even if she had somehow found causation, if the commission had found causation for fibromyalgia, she still failed to prove that she was permanently and totally disabled. She was working. She worked after this for two years. The commission correctly found that there was no evidence that her injury impaired her disability, no evidence she performed a job search. And this is after the surgeries, after March 2010. Here's where I was getting at the contrived. So the commission viewed Ms. Fogarty's vocational experts as contrived, as they merely provided the opinions they were hired to provide, i.e., that she's permanently and totally disabled. The commission's words, such opinions are illogical and not supported by the credible evidence. The facts here are disputed, Your Honor. This is a manifest weight of the evidence case. The commission correctly weighed that evidence, did not find Petitioner credible, did not find her experts persuasive, found our experts credible and persuasive. Any other questions, Your Honor? The argument of opposing counsel started out with the lack of vocational rehabilitation. Could you address that? Absolutely. It was fully disputed whether vocational rehabilitation was appropriate. And that was brought up in my brief and the Euclid case there as well about the rule indicating if vocational rehabilitation is appropriate, then respondents should offer the same. That was a fully disputed issue here as evidenced by the commission's decision weighing the experts and finding that she wasn't entitled to vocational rehabilitation. Counsel indicates that they didn't bring up maintenance in the commission decision. They absolutely brought up maintenance because they terminated it in November of 2010 when she was found at maximum medical improvement. I don't believe there are any more questions. Thank you for your time, Your Honor. Respondents ask that you affirm the commission's decision. Again, it is within the manifest way of the evidence. Thank you. Thank you. Counsel, you may reply. Thank you. The petitioner last worked right before emergency surgery in August of 2008. That was the last time she worked. And she worked for other employers. The commission and the cases, or rather the case law, does not say that the rule 5071.10.10 is optional or whether it's appropriate. When there's restrictions as such on 11-10-10, November of 10, and May of 10 by Dr. Prenendix, that she had spica splints, that she had severe restrictions, that the vocational assessor, Lucas, said that she was unable to be gainfully employed. There were no jobs in the area for her to do. The fact that whether it's appropriate or not is based upon whether a vocational expert can determine if she's able to do gainful employment. On that topic, he referred to the employer's vocational expert, that she didn't need the services. Did you present a voc expert that said she did? Yes. Jeffrey Lucas, Dr. Lucas. So the commission weighed the testimony, right? Right. But Dr. Lucas met with her, met with me, had all the records from all the doctors. Ms. Babbitt, who did it four months before arbitration, didn't meet with her, wasn't given all the records by defendants, and wrote that she could not do anything because she's a convicted felon. She couldn't get a job. She never met her. She didn't know what she was dealing with. Is that the basis for her decision? She was a convicted felon. I didn't see that. It's in her report. Because she's a convicted felon, she can't work. That's disproved because she got four or five jobs before she stopped working, before she went into the surgical procedures. And I agree. There's no need. I've been doing this almost 40 years. I've never seen a decision written with a language that is almost outrageous to be calling a person like this, who comes out of jail with two kids, and a husband that tries to restart her family, and does self-created job search after she was fired by her employer on June 30th of 06, two days after she filed that. I have the chills right now thinking what I'm telling you. It's bizarre. You said it was bizarre. And I've never seen anything like it. Because when you look at the arbitrator's decision, we had 11 or 12 hearings. He doesn't use any of those words. And he's met with her 11 times. And he's reviewed all the evidence. And he knew she was a convicted felon. It's in this decision. But why is it seems like she's being treated worse under the Workers' Comp Act than she would be if she had any illness and she was in prison. I don't want to say that. But that's what the facts appear. And I don't want to use, well, she was thrown under the bus. I don't want to use that. I've used it, but it's used too much today. I rest. And I thank you. And I would just ask that the case could be, after your thoughts, that it be remanded to the commission to determine. And they didn't rule on maintenance. They didn't touch. They didn't rule on maintenance. They didn't rule on 7110.10. They didn't rule on vocational rehabilitation, which were documented issues in the hearing stipulations. Okay. Thank you. Thank you, counsel, both, for your arguments in this matter this morning. It will be taken under advisement and a written disposition shortly.